**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

In Re. 2025 Subpoena to Children's
National Hospital

Case No.: JRR 2 5 MC 0 0 7 0 9

**MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION TO QUASH SUBPOENA DUCES TECUM**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION .............................................................................................................. 1

STATEMENT OF FACTS .................................................................................................. 2

I.    The Federal Government's Campaign to End Transgender Healthcare .................. 2

II.   The June 11 Subpoenas ....................................................................................... 5

III.  Related Rulings on Identical Subpoenas ............................................................. 7

IV.   CNH's Provision of Transgender Healthcare ...................................................... 10

V.    Movants are Current and Former CNH Patients and Their Parents Who Seek to
      Protect Their Identities and Confidential Medical Records from Government
      Disclosure ........................................................................................................... 12

LEGAL STANDARD ........................................................................................................ 15

ARGUMENT .................................................................................................................... 16

I.    Patients and Their Parents Have a Fourth Amendment Right to Be Free from
      Unreasonable Search and Seizure of Their Private Medical Records .................... 16

      1.    The Subpoena was Issued for an Improper Purpose ..................................... 17

      2.    The Sweeping and Virtually Unlimited Scope of the Subpoena Does Not
            Reasonably Relate to or Further its Supposed Purpose of Investigating
            Healthcare Fraud .......................................................................................... 20

II.   Patients and Their Parents Have a Fifth Amendment Right to Privacy in Their
      Medical Records That Outweighs the Government's Interests ............................... 21

      1.    Patients and Their Parents Have a Reasonable Expectation of Privacy in
            Their Medical Records .................................................................................. 22

      2.    Patients and Their Parents' Interests in Protecting the Confidentiality of
            Their Medical Records Outweighs the Government's Interest in
            Compelling the Information ........................................................................... 23

            A.    *Westinghouse* Factors One, Two and Three ...................................... 24

            B.    *Westinghouse* Factor Four ................................................................ 27

i

C.    *Westinghouse* Factor Five ................................................................29

D.    *Westinghouse* Factors Six and Seven................................................31

CONCLUSION ................................................................................................33

**TABLE OF AUTHORITIES**

**Cases**

*A. et al,*
   2:25-mc-01067 (W.D. Pa. Sept. 24, 2025) ..................................................................... 24

*Am. Fed'n of State, Cnty. and Mun. Emps., AFL-CIO v. Soc. Sec. Admin.,*
   771 F.Supp.3d 717 (D. Md. 2025) ............................................................................... 22

*Carpenter v. United States,*
   585 U.S. 296 (2018) ......................................................................................................... 16

*City of Ontario, Cal. v. Quon,*
   560 U.S. 746 (2010) ......................................................................................................... 16

*Dobbs v. Jackson Women's Health Organization,*
   597 U.S. 215 (2022) ......................................................................................................... 22

*Doe v. Broderick,*
   225 F.3d 440 (4th Cir. 2000) ......................................................................................... 22

*Doe v. City of New York,*
   15 F.3d 264 (2d Cir. 1994) ............................................................................................ 23

*Donovan v. Lone Steer, Inc.,*
   464 U.S. 408 (1984) ......................................................................................................... 17

*Fed. Trade Comm'n v. Am. Tobacco Co.,*
   264 U.S. 298 (1924) ......................................................................................................... 16

*Gilmore v. Jones,*
   339 F.R.D. 111 (W.D. Va. 2021) ................................................................................... 21

*Grimm v. Gloucester Cty. Sch. Bd.,*
   972 F.3d 586 (4th Cir. 2020) ......................................................................................... 29

*Hale v. Henkel,*
   201 U.S. 43 (1906) ........................................................................................................... 16

*In Re: Subpoena No. 25-1431-014,*
   No. 2:25-mc-00039 (E.D. Pa. July 8, 2025) .......................................................... *passim*

*In Re: Admin. Subpoena No. 25-1431-019,*
   No. 1:25-mc-91324-MJJ, 2025 WL 2607784 (D. Mass. Sept. 9, 2025) .................. *passim*

*In re Grand Jury Subpoena John Doe No. A01-209,*
  197 F. Supp. 2d 512 (E.D. Va. 2002) ...................................................................... 22

*In re Subpoenas Duces Tecum Nos. A99-0001, A99-0002, A99-0003 and A99-0004,*
  51 F. Supp. 2d 726 (W.D. Va. 1999) ...................................................................... 23

*In re: Grand Jury 2021 Subpoenas,*
  87 F.4th 229 (4th Cir. 2023) ................................................................................... 15

*In Re: Sealed Case (Admin. Subpoena,*
  42 F.3d 1412 (D.C. Cir. 1994) ................................................................................ 21

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992) ................................................................................................ 15

*N.L.R.B. v. Interbake Foods, LLC,*
  637 F.3d 492 (4th Cir. 2011) ................................................................................... 15

*Nw. Mem'l Hosp. v. Ashcroft,*
  362 F.3d 923 (7th Cir. 2004) ............................................................... 26, 27, 28, 29

*Patients of Dr. Solomon v. Board of Physician Quality Assur.,*
  85 F. Supp. 2d 545 (D. Md. 1999) .......................................................................... 24

*Payne v. Taslimi,*
  998 F.3d 648 (4th Cir. 2021) ................................................................................... 22

*Powell v. Schriver,*
  175 F.3d 107 (2d Cir. 1999) .................................................................................... 16

*Queerdoc, PLLC v. U.S. Department of Justice,*
  No. 2:25-mc-00042-JNW, 2025 WL 3013568 (W.D. Wash. Oct. 27, 2025) ......... *passim*

*Skinner v. Railway Labor Executives' Assn.,*
  489 U.S. 602 (1989) ................................................................................................ 16

*Tankersley v. Almand,*
  837 F.3d 390 (4th Cir. 2016) ................................................................................... 27

*U.S. v. Bailey (In Re: Subpoena Duces Tecum),*
  228 F.3d 341 (4th Cir. 2000) ............................................................... 15, 16, 17, 20

*U.S. v. Morton Salt Co.,*
  338 U.S. 632 (1950) ................................................................................................ 15

*U.S. v. Westinghouse Elec. Corp.*,
   638 F.2d 570 (3d Cir. 1980) .................................................................. 23, 24, 25

*United States v. Harrington*,
   388 F.2d 520 (2d Cir. 1968) ............................................................................. 20

*United States v. Idema*,
   118 F. App'x 740 (4th Cir. 2005) .................................................................... 15

*United States v. Powell*,
   379 U.S. 48 (1964) ............................................................................................ 17

*United States v. R. Enters.*,
   498 U.S. 292 (1991) ...................................................................................... 1, 17

*United States v. Theodore*,
   479 F.2d 749 (4th Cir. 1973) ........................................................................... 20

*Walls v. City of Petersburg*,
   895 F.2d 188 (4th Cir. 1990) ........................................................... 21, 22, 23, 33

*Watson v. Lowcountry Red Cross*,
   974 F.2d 482 (4th Cir. 1992) ........................................................................... 23

*Webster v. Doe*,
   486 U.S. 592 (1988) ......................................................................................... 16

*Whalen v. Roe*,
   429 U.S. 589 (1977) .................................................................................... 16, 21

**Statutes**

18 U.S.C. § 3486(a)(1) ........................................................................................ 20

18 U.S.C. § 3486(e) ...................................................................................... 30, 31

5 U.S.C. § 552a(b)(7) ......................................................................................... 31

Pub. L. No. 93-579, 88 Stat. 1896 ..................................................................... 27

**Other Authorities**

*AMA Adopts New Policies on First Day of Voting at 2019 Annual Meeting*, AM. MED.
   ASS'N (June 10, 2019),
   https://www.ama-assn.org/press-center/ama-press-releases/ama-adopts-new-
   policies-first-day-voting-2019-annual-meeting ............................................... 29

*Department of Justice Subpoenas Doctors and Clinics Involved in Performing Transgender Medical Procedures on Children*, OFF. OF PUB. AFFS., U.S. DEP'T OF JUST. (July 9, 2025), https://www.justice.gov/opa/pr/department-justice-subpoenas-doctors-and-clinics-involved-performing-transgender-medical ........................................................................5

Gina M. Sequeira et al., *Transgender Youth's Disclosure of Gender Identity to Providers Outside of Specialized Gender Centers*, 66 J.ADOLESC. HEALTH 691, 696 (2020) ........................................................................28

Julius Bourke & Simon Wessely, *Confidentiality*, 336 BMJ 888, 888 (April 19, 2008), https://pmc.ncbi.nlm.nih.gov/articles/PMC2323098/pdf/bmj-336-7649-prac-00888.pdf........................................................................27

*National Child Abuse Prevention Month, 2025*, THE WHITE HOUSE (April 3, 2025), https://www.whitehouse.gov/presidential-actions/2025/04/national-child-abuse-prevention-month-2025/........................................................................4

President Trump Executive Order 14187 ("Healthcare Order") ........................................................................2

*President Trump Is Delivering on His Commitment to Protect Our Kids*, THE WHITE HOUSE (Feb. 3, 2025), https://www.whitehouse.gov/articles/2025/02/president-trump-is-delivering-on-his-commitment-to-protect-our-kids/........................................................................2

U.S. OFF. OF THE ASSISTANT ATT'Y GEN., *Memorandum: Civil Division Enforcement Priorities 2-3* (June 11, 2025), https://www.justice.gov/civil/media/1404046/dl?inline ........................................................................5

U.S. OFF. OF THE ATT'Y GEN., *Memorandum for Select Component Heads: Preventing the Mutilation of American Children* (Apr. 22, 2025), https://www.justice.gov/ag/media/1402396/dl ........................................................................3, 7, 18, 30

# INTRODUCTION

For decades, parents have sought well-established medical treatments for their transgender children from Children's National Hospital ("CNH"). But this summer, the Department of Justice ("DOJ"), acting in pursuance of the overall policy objectives of the Trump Administration (the "Administration"), served broad and sweeping administrative subpoenas on hospitals across the country, including CNH. This subpoena, issued in bad faith and without any proper purpose, seeks years' worth of highly sensitive and confidential records of every patient under the age of eighteen who received medical care from CNH's Gender Development Program. As the Supreme Court has explained, a subpoena is not a license for the federal government to go on a "fishing expedition[]" for any evidence of wrongdoing. *United States v. R. Enters.*, 498 U.S. 292, 299 (1991). The medical records sought are of the most intimate kind, detailing information regarding patients' mental health and adolescent physical development. The motivation for this intrusion is clear: the Administration seeks to use the immense power of DOJ to threaten providers, intimidate patients and their families, and end transgender medical care. Transgender medical treatments are legal in this state, as well as in the District of Columbia, and endorsed by every reputable medical association as a critical medical intervention. The Administration has no legitimate purpose or compelling reason to violate CNH patients' constitutional rights to privacy in their medical records and freedom from unreasonable government intrusion. The subpoena should be quashed.

1

## STATEMENT OF FACTS

### I.    The Federal Government's Campaign to End Transgender Healthcare

On January 28, 2025, President Trump issued Executive Order 14187 ("Healthcare Order"),[1] beginning this Administration's nationwide campaign to prevent transgender adolescents from obtaining established medical care that is known to be safe and effective. The Healthcare Order alleged that medical professionals across the country were performing harmful and irreversible medical treatments on minors under, what it described as, "the radical and false claim that adults can change a child's sex."[2] The Healthcare Order equated transgender medical treatments with severe physical harm, directed the Attorney General to conduct investigations related to such care, and made clear that its purpose was to "end" transgender healthcare in the United States.[3]

In early February, the White House issued a press release about the Healthcare Order, stating, "[i]t's already having its intended effect" of restricting the availability of transgender healthcare for minors.[4] The press release announced that "[h]ospitals around the country are taking action to downsize or eliminate their so-called 'gender-affirming

---

[1] *Protecting Children From Chemical and Surgical Mutilation*, THE WHITE HOUSE (Jan. 28, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/protecting-children-from-chemical-and-surgical-mutilation/.

[2] *Id.*

[3] *Id.*

[4] *President Trump Is Delivering on His Commitment to Protect Our Kids*, THE WHITE HOUSE (Feb. 3, 2025), https://www.whitehouse.gov/articles/2025/02/president-trump-is-delivering-on-his-commitment-to-protect-our-kids/.

care' programs," including "Children's National Hospital," which "has 'paused' prescribing puberty blockers and hormone therapies for minors."[5]

Pursuant to the Healthcare Order, in April 2025, the Attorney General issued a Memorandum for Select Component Heads ("Prosecution Memo"), escalating the Administration's threats against medical providers and hospitals providing transgender healthcare to adolescents.[6] The Prosecution Memo declared that "the Department [of Justice] will act decisively to protect our children and hold accountable those" who provide this medically necessary healthcare and "put[] medical practitioners, hospitals, and clinics on notice: In the United States, it is a felony to perform, attempt to perform, or conspire to perform" transgender medical treatments "on a person under the age of 18."[7] The Attorney General directed "all U.S. Attorneys to investigate all suspected cases of" such care and to prosecute all "offenses to the fullest extent possible."[8]

The Prosecution Memo also directed DOJ "to undertake appropriate investigations of any violations of the Food, Drug, and Cosmetic Act by manufacturers and distributors engaged in misbranding by making false claims about the on- or off-label use of puberty blockers, sex hormones, or any other drug used to facilitate a child's so-called 'gender transition'" and "investigations under the False Claims Act of false claims submitted to

---

[5] *Id.*

[6] U.S. OFF. OF THE ATT'Y GEN., *Memorandum for Select Component Heads: Preventing the Mutilation of American Children* (Apr. 22, 2025), https://www.justice.gov/ag/media/1402396/dl.

[7] *Id.* at 3.

[8] *Id.* at 3-4.

federal health care programs for any noncovered services" related to transgender healthcare.[9]

The Prosecution Memo clearly articulates the purpose of those investigations:

Protecting America's children must be our top priority, whether from drug cartels, terrorists, or even our own medical community. Every day, we hear more harrowing stories about children who will suffer for the rest of their lives because of the unconscionable ideology behind "gender-affirming care." Under my leadership, the Department of Justice will *bring these practices to an end*.[10]

The Prosecution Memo also announced that DOJ would "partner with state attorneys general to identify leads, share intelligence, and build cases against hospitals and practitioners violating federal or state laws" banning transgender adolescent healthcare and "other, related practices."[11]

In addition to falsely portraying transgender healthcare as physical harm, the Administration began falsely equating this care with child abuse. In April, the Administration issued a Proclamation in connection with National Child Abuse Prevention Month stating that "the sinister threat of gender ideology" is "one of the most prevalent forms of child abuse facing our country today," specifically naming "hormone therapy [and] puberty blockers."[12] The Administration "pledge[d] to stop the atrocity of

---

[9] *Id.* at 4.

[10] *Id.* at 6 (emphasis added).

[11] *Id.* at 5.

[12] *National Child Abuse Prevention Month, 2025*, THE WHITE HOUSE (April 3, 2025), https://www.whitehouse.gov/presidential-actions/2025/04/national-child-abuse-prevention-month-2025/.

child abuse in all its forms" and threatened that those who facilitate access to transgender healthcare "will be punished to the fullest extent of the law."[13]

These pronouncements make clear that the Attorney General and DOJ are using investigations to end transgender healthcare by intimidating providers and patients.

## II.    The June 11 Subpoenas

On June 11, 2025, the Assistant Attorney General of the DOJ Civil Division wrote that the Civil Division will use "all available resources to prioritize investigations of doctors, hospitals, pharmaceutical companies, and other appropriate entities" providing transgender medical treatments through the Food, Drug, and Cosmetic Act ("FDCA") and the False Claims Act.[14] That same day, DOJ took action, issuing "more than 20 subpoenas to doctors and clinics involved in performing transgender medical procedures on children."[15] Again, the Attorney General made the Administration's intent clear, stating that "[m]edical professionals and organizations" that provide transgender healthcare to adolescents "will be held accountable by this Department of Justice."[16] This concerted campaign and the unprecedented public announcements demonstrate an improper purpose to intimidate and deter the provision of lawful transgender healthcare.

---

[13] *Id.*

[14] U.S. OFF. OF THE ASSISTANT ATT'Y GEN., *Memorandum: Civil Division Enforcement Priorities 2-3* (June 11, 2025), https://www.justice.gov/civil/media/1404046/dl?inline.

[15] *Department of Justice Subpoenas Doctors and Clinics Involved in Performing Transgender Medical Procedures on Children*, OFF. OF PUB. AFFS., U.S. DEP'T OF JUST. (July 9, 2025), https://www.justice.gov/opa/pr/department-justice-subpoenas-doctors-and-clinics-involved-performing-transgender-medical.

[16] *Id.*

CNH was among the hospitals subpoenaed by DOJ.[17] While the subpoena has never been released, DOJ confirmed to Movants' counsel that it is "substantially identical"[18] to the publicly available June 11 subpoenas issued to Children's Hospital of Philadelphia,[19] Boston Children's Hospital,[20] and Queerdoc, PLLC.[21] The subpoenas all contain the same 15 requests that seek practically every document related to transgender healthcare at these entities for the past five and a half years.[22] The subpoenas request a staggering amount of sensitive patient information, including:

- Request 11: "Documents sufficient to identify each patient (by name, date of birth, social security number, address, and parent/guardian information) who was prescribed puberty blockers or hormone therapy."

- Request 12: "For each such patient identified in Subpoena [Request 11], documents relating to the clinical indications, diagnoses, or assessments that formed the basis for prescribing puberty blockers or hormone therapy."

- Request 13: "All documents relating to informed consent, patient intake, and parent or guardian authorization for minor patients identified in [Request 11], including any disclosures about off-label use (i.e., uses not approved by the United States Food and Drug Administration) and potential risks."[23]

---

[17] *See* Aff. of Eve Hill, Esq., in Supp. of Mot. to Quash Subpoena Duces Tecum.

[18] *Id.* at ¶ 20.

[19] *See In Re: Subpoena No. 25-1431-014*, No. 2:25-mc-00039 (E.D. Pa. July 8, 2025), Dkt. No. 1 (Mot. to Limit Subpoena).

[20] *See In Re: Admin. Subpoena No. 25-1431-019*, No. 1:25-mc-91324 (D. Mass. July 8, 2025), Dkt. No. 5-1 (Strachan Decl. Ex. 1).

[21] *See Queerdoc, PLLC v. U.S. Department of Justice*, No. 2:25-mc-00042-JNW, 2025 WL 3013568 (W.D. Wash. Oct. 27, 2025).

[22] *See, e.g., In Re: Subpoena No. 25-1431-014,* No. 2:25-mc-00039 (E.D. Pa. July 8, 2025), Dkt. No. 1 at 35, Definitions ¶ 4.

[23] *See, e.g., Id.* at 40, ¶¶ 11-13.

The compliance date is July 9, 2025.[24]

Neither DOJ nor CNH has sought the consent of any family with regards to the subpoena nor otherwise communicated with them about it.[25] Regardless, DOJ now seeks unfettered access to everything from their social security numbers and addresses to the intimate details they shared with their healthcare providers about their gender dysphoria diagnoses and the course of treatment they chose with their physician and parents. And DOJ has stated that it will not just scrutinize that information, but that it will share that information with other law enforcement authorities to facilitate prosecution of the same hospitals and healthcare providers under state and local laws.[26]

### III.    Related Rulings on Identical Subpoenas

As of this filing, the only two federal district courts to rule on substantively identical subpoenas have granted the resulting motions to quash, filed on behalf of the subpoenaed party, in their entirety. In Massachusetts, Judge Myong Joun quashed DOJ's administrative subpoena issued against Boston Children's Hospital ("BCH"), determining that DOJ had "failed to show proper purpose," noting "the Government has not submitted

---

[24] *Id.* at 1.

[25] Aff. of Eve Hill at ¶ 21; *see also, e.g.*, Decl. of Parent F.F. at ¶ 11 ("We have not been contacted by federal officials about my child's care, and we have never been told that any part of my child's medical treatment is the subject of a federal government inquiry.").

[26] U.S. OFF. OF THE ATT'Y GEN., *Memorandum for Select Component Heads: Preventing the Mutilation of American Children* 5 (Apr. 22, 2025), https://www.justice.gov/ag/media/1402396/dl ("I will partner with state attorneys general to identify leads, share intelligence, and build cases.").

any affidavits or other evidence" to justify the investigation.[27] The Court emphasized the sweeping scope of the requested documents all "while not offering an iota of suspicion that BCH is actually engaging in fraudulent billing practices or off-label promotion."[28] Judge Joun concluded that, instead, "the true purpose of issuing the subpoena is to interfere with the Commonwealth of Massachusetts' right to protect [transgender healthcare] within its borders, to harass and intimidate BCH to stop providing such care, and to dissuade patients from seeking such care."[29] Finding that DOJ's subpoena was "motivated only by bad faith," the court granted BCH's motion to quash in full.[30]

Judge Jamal Whitehead in Washington State reached a similar conclusion regarding the identical subpoena DOJ issued to QueerDoc, a small telehealth provider that offers transgender healthcare services in ten states.[31] Judge Whitehead held that while the government's authority to issue administrative subpoenas is broad, it is not boundless, and that "when a federal agency issues a subpoena *not* to investigate legal violations but to intimidate and coerce providers into abandoning lawful medical care, it exceeds its legitimate authority and abuses the judicial process."[32] The court rejected

---

[27] *In Re: Admin. Subpoena No. 25-1431-019*, No. 1:25-mc-91324-MJJ, 2025 WL 2607784, at *5 (D. Mass. Sept. 9, 2025).

[28] *Id.* at *6.

[29] *Id.* at *7.

[30] *Id.*

[31] *Queerdoc, PLLC v. U.S. Department of Justice*, No. 2:25-mc-00042-JNW, 2025 WL 3013568 (W.D. Wash. Oct. 27, 2025).

[32] *Id.* at *3 (emphasis in original).

DOJ's claim that its investigation was aimed at uncovering fraud, concluding, instead, that the record demonstrated "DOJ has abandoned good faith investigation in favor of policy enforcement through prosecutorial coercion."[33]

The Court found that "[t]he timeline tells the story," noting the Healthcare Order declaring transgender healthcare "'a stain on our Nation's history' that 'must end,'" and the Attorney General's Prosecution Memo pledging to go after those who provide such care, directly preceded the subpoenas.[34] Judge Whitehead wrote that "[t]his is not speculation about hidden motives—it is the Administration's explicit agenda," and that "[n]o clearer evidence of improper purpose could exist than the Government's own repeated declarations that it seeks to end the very practice it claims to be merely investigating."[35] Finding that DOJ "issued the subpoena first and searched for a justification second,"[36] the court concluded that the subpoena was issued to "pressure providers to cease offering [transgender healthcare] rather than to investigate specific unlawful conduct."[37] Thus, as in Massachusetts, the Court granted QueerDoc's motion to quash in full.

---

[33] *Id.* at *5.

[34] *Id.*

[35] *Id.*

[36] *Id.* at *6.

[37] *Id.* at *7.

**IV.    CNH's Provision of Transgender Healthcare**

CNH opened in 1870 as one of the nation's first children's hospitals and remains

the "leading pediatric health system in the Washington, D.C., area," [38] including the

Maryland and Northern Virginia suburbs. CNH's mission includes "[p]roviding a quality

healthcare experience for our patients and families," "[i]mproving health outcomes for

children regionally, nationally and internationally," and "[l]eading the creation of

innovative solutions to pediatric health challenges."[39]

As part of this foundational mission, CNH has provided transgender health care to

its patients for the past 20 years through its Gender Development Program, with primary

locations in Washington, D.C., and Rockville, Maryland.[40] "As one of the earliest

founded youth gender programs," CNH's Gender Development Program consists of a

"multidisciplinary team of specialists" who provide critical healthcare to transgender

youth and "conduct[s] cutting-edge research to move forward [the] understanding of

youth gender development and ways to best support" this vulnerable patient

population.[41] Such care was informed by research findings and included behavioral

---

[38] *About Us*, CHILDREN'S NATIONAL, https://www.childrensnational.org/about-us (last visited Nov. 14, 2025).

[39] *Our Mission Vision and Values*, CHILDREN'S NATIONAL, https://www.childrensnational.org/about-us/mission-and-vision (last visited Nov. 14, 2025).

[40] *Gender Development Program*, CHILDREN'S NATIONAL, https://www.childrensnational.org/get-care/departments/gender-development-program (last visited Nov. 14, 2025).

[41] *Id.*

healthcare, resources for social transition, puberty-blocking medicine, and hormone therapy. That care required patient medical evaluations, treatment recommendations, and treatment plans in the most sensitive areas, including mental health, physical development, and socialization.[42] In providing transgender healthcare to its adolescent patients, CNH followed widely accepted and well-established guidelines for the treatment of gender dysphoria,[43] all while complying with all applicable and relevant local, state, and federal laws.

On January 30, 2025, CNH issued a public statement announcing it was "pausing all puberty blockers and hormone therapy prescriptions for transgender youth patients," citing guidelines in the Healthcare Order issued by the White House two days earlier.[44] Later that summer, and five weeks after DOJ issued its sweeping subpoenas, CNH announced that it would end transgender medical treatments for all patients effective August 30, 2025 because of "escalating legal and regulatory risks" from this Administration.[45] Three days later, the Attorney General took to the social media

_____

[42] *See, e.g.*, Decl. of Parent G.G. at ¶ 5 ("[M]y child and I disclosed private sensitive information [to CNH] about my child's mental and physical health, emotional state, development, school experiences, relationships with peers and family members, and more. All of this information was shared with medical providers so they could provide diagnoses, treatment recommendations, and treatment plans for my child.").

[43] *See Youth Pride Clinic*, CHILDREN'S NATIONAL, https://www.childrensnational.org/get-care/departments/youth-pride-clinic (last visited Nov. 14, 2025).

[44] *Children's National Hospital Statement on Executive Order*, CHILDREN'S NATIONAL HOSPITAL (Jan. 30, 2025), https://www.childrensnational.org/about-us/newsroom/2025/statement-on-executive-order.

[45] Jenna Portnoy, Kyle Swenson & Karina Elwood, *Children's National Hospital to End Gender-Transition Care*, Washington Post (Jul. 18, 2025),

platform "X," taking credit for CNH's cessation of gender-transition medical care, stating: "At President Trump's direction, [DOJ] will continue enforcing the law against institutions like Children's National."[46] Hospitals around the nation followed suit; developments this White House applauded.[47]

## V.    Movants are Current and Former CNH Patients and Their Parents Who Seek to Protect Their Identities and Confidential Medical Records from Government Disclosure

Movants are eight families who received gender transition medical care, for either themselves or their children, through CNH's Gender Development Program from January 1, 2020 to the present.[48] Throughout this time period, Movants engaged with CNH providers and medical professionals, both in-person and through electronic communications.[49] These interactions involved the disclosure of highly sensitive and personal information relating to their children's physical development, mental health, family relationships, and social environment, all for the purpose of obtaining medical diagnoses, treatment recommendations, and healthcare for gender dysphoria.[50]

_____

https://www.washingtonpost.com/dc-md-va/2025/07/18/children-national-ends-gender-transition-care/.

[46] Attorney General Pamela Bondi (@AGPamBondi), X (July 21, 2025), https://x.com/AGPamBondi/status/1947362978526814579.

[47] *President Trump Promised to End Child Sexual Mutilation—and He Delivered,* THE WHITE HOUSE (July 25, 2025), https://www.whitehouse.gov/articles/2025/07/president-trump-promised-to-end-child-sexual-mutilation-and-he-delivered/.

[48] *See* Movants' Decls. at ¶¶ 1.

[49] *See* Decl. of Parent A.A. at ¶ 5; Decl. of Parent B.B. at ¶ 3; Decl. of Parent C.C. at ¶ 3; Decl. of Parent D.D. at ¶ 2; Decl. of Parent E.E. at ¶ 2; Decl. of Parent F.F. at ¶ 5; Decl. of Youth F.F. at ¶ 2; Decl. of Parent G.G. at ¶ 4; Decl. of Parent H.H. at ¶ 2.

[50] *See* Decl. of Parent A.A. at ¶ 6; Decl. of Parent B.B. at ¶ 4; Decl. of Parent C.C. at ¶ 5;

As part of this care, the minor patients underwent mental health assessments conducted by licensed providers, participated in consultations with physicians regarding treatment options alongside their parents, and received puberty blockers and hormone therapy under medical supervision.[51] Follow-up appointments addressed the children's emotional well-being, response to prescribed medications, and the overall effectiveness of treatment.[52] At all times, Movants understood that these communications and records were strictly confidential and would be protected from disclosure.[53]

Movants placed deep trust in CNH to safeguard their most sensitive personal information.[54] They understood that the hospital's professional obligations—and federal and state privacy protections—ensured that the details of the medical care they were

---

Decl. of Youth C.C. at ¶ 3; Decl. of Parent D.D. at ¶ 3; Decl. of Parent E.E. at ¶ 3; Decl. of Youth E.E. at ¶ 12; Decl. of Parent F.F. at ¶ 6; Decl. of Youth F.F. at ¶ 4; Decl. of Parent G.G. at ¶ 5; Decl. of Parent H.H. at ¶ 4.

[51] *See* Decl. of Parent A.A. at ¶¶ 7-9; Decl. of Parent B.B. at ¶¶ 5-7; Decl. of Parent C.C. at ¶¶ 6-7; Decl. of Youth C.C. at ¶¶ 4-5; Decl. of Parent D.D. at ¶¶ 4-5; Decl. of Parent E.E. at ¶¶ 4-5; Decl. of Youth E.E. at ¶ 8; Decl. of Parent F.F. at ¶ 7, 10; Decl. of Parent G.G. at ¶¶ 5-6; Decl. of Parent H.H. at ¶¶ 5-6.

[52] *See* Decl. of Parent A.A. at ¶¶ 10; Decl. of Parent B.B. at ¶ 8; Decl. of Parent C.C. at ¶ 9; Decl. of Youth C.C. at ¶¶ 6; Decl. of Parent D.D. at ¶ 6; Decl. of Youth E.E. at ¶ 6; Decl. of Parent F.F. at ¶ 6; Decl. of Youth F.F. at ¶ 5; Decl. of Parent G.G. at ¶ 8; Decl. of Parent H.H. at ¶ 7.

[53] *See* Decl. of Parent A.A. at ¶ 3; Decl. of Parent B.B. at ¶ 2; Decl. of Parent C.C. at ¶¶ 10, 20; Decl. of Youth C.C. at ¶ 8; Decl. of Parent D.D. at ¶ 7; Decl. of Parent E.E. at ¶ 6; Decl. of Youth E.E. at ¶ 5; Decl. of Parent F.F. at ¶ 15; Decl. of Youth F.F. at ¶ 7; Decl. of Parent G.G. at ¶¶ 2-3; Decl. of Parent H.H. at ¶ 8.

[54] *See* Decl. of Parent A.A. at ¶ 4; Decl. of Parent B.B. at ¶¶ 11, 20; Decl. of Parent C.C. at ¶ 11; Decl. of Youth C.C. at ¶ 3; Decl. of Parent D.D. at ¶ 10; Decl. of Parent E.E. at ¶ 7; Decl. of Youth E.E. at ¶ 1; Decl. of Parent F.F. at ¶ 4; Decl. of Youth F.F. at ¶ 3; Decl. of Parent G.G. at ¶ 15; Decl. of Parent H.H. at ¶ 17.

receiving would not be shared beyond the healthcare setting.[55] Disclosure of these families' medical information to the government would constitute a profound breach of that trust and would expose these families to serious risks of emotional distress, harassment, discrimination, and even potential prosecution.[56] It would also severely undermine Movants' willingness to seek necessary medical care in the future,[57] with potentially devastating consequences for long-term health and well-being. Even the release of redacted or partially anonymized records would fail to protect their privacy, as unique personal details—such as school environment, family circumstances, and community connections—could easily render them identifiable.[58]

For these reasons, Movants, who currently reside in Maryland and throughout the Washington, D.C. metropolitan area, now come to this Court seeking to protect the

---

[55] *See* Decl. of Parent A.A. at ¶ 12; Decl. of Parent B.B. at ¶ 10; Decl. of Parent C.C. at ¶ 11; Decl. of Youth C.C. at ¶ 14; Decl. of Parent D.D. at ¶ 7; Decl. of Parent E.E. at ¶ 13; Decl. of Youth E.E. at ¶¶ 7, 12; Decl. of Parent F.F. at ¶ 4; Decl. of Youth F.F. at ¶ 7; Decl. of Parent G.G. at ¶ 10; Decl. of Parent H.H. at ¶ 9.

[56] *See* Decl. of Parent A.A. at ¶¶ 13-15; Decl. of Parent B.B. at ¶¶ 12-14, 20; Decl. of Parent C.C. at ¶¶ 12-13; Decl. of Youth C.C. at ¶ 10; Decl. of Parent D.D. at ¶¶ 11-14; Decl. of Parent E.E. at ¶¶ 8-9; Decl. of Youth E.E. at ¶ 9; Decl. of Parent F.F. at ¶¶ 12-13; Decl. of Youth F.F. at ¶ 8; Decl. of Parent G.G. at ¶¶ 11-12; Decl. of Parent H.H. at ¶¶ 10-11.

[57] *See* Decl. of Parent A.A. at ¶¶ 16-17; Decl. of Parent B.B. at ¶¶ 15-16; Decl. of Parent C.C. at ¶¶ 13-14, 16; Decl. of Youth C.C. at ¶¶ 11-12; Decl. of Parent D.D. at ¶ 13; Decl. of Parent E.E. at ¶ 10; Decl. of Youth E.E. at ¶ 3, 10; Decl. of Parent F.F. at ¶ 14; Decl. of Youth F.F. at ¶ 10; Decl. of Parent G.G. at ¶ 13; Decl. of Parent H.H. at ¶¶ 12, 15.

[58] *See* Decl. of Parent A.A. at ¶ 18; Decl. of Parent B.B. at ¶ 19; Decl. of Parent C.C. at ¶ 18; Decl. of Youth C.C. at ¶ 13; Decl. of Parent D.D. at ¶ 15; Decl. of Parent E.E. at ¶ 12; Decl. of Youth E.E. at ¶ 13; Decl. of Parent F.F. at ¶ 16; Decl. of Youth F.F. at ¶ 11; Decl. of Parent G.G. at ¶ 14; Decl. of Parent H.H. at ¶ 16.

privacy of their medical information and identities and to prevent the disclosure of any

medical records or identifying details to the government.

## LEGAL STANDARD

In determining whether to enforce an administrative subpoena, courts typically

consider three factors: first, whether "the inquiry is within the authority of the agency,"

second, whether "the demand is not too indefinite," and third, whether "the information

sought is reasonably relevant." *U.S. v. Morton Salt Co.*, 338 U.S. 632, 652 (1950). Courts

must also ensure that any administrative subpoena complies with dictates of the U.S.

Constitution, including the Fourth and Fifth Amendments. *See U.S. v. Bailey (In Re:*

*Subpoena Duces Tecum)*, 228 F.3d 341 (4th Cir. 2000). "While judicial scrutiny of

administrative subpoenas is, to be sure, limited . . . courts do not simply order the

enforcement of subpoenas as a matter of course, and certainly not blindly." *N.L.R.B. v.*

*Interbake Foods, LLC*, 637 F.3d 492, 498-99 (4th Cir. 2011) (internal citations omitted).

"Article III courts protect[] against abuse of the subpoena power" by determining

"whether to enforce the subpoena and, in making that determination, evaluat[ing] the

claims of privilege" brought by movants. *Id.* at 498.[59]

---

[59] Movants have Article III standing because compelled disclosure of their identities,
sensitive medical and mental health records, and parental consent materials constitutes a
concrete and imminent injury traceable to the subpoena and redressable by quashing
it. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Nonparties may challenge
subpoenas that implicate personal rights or constitutional interests. *See In re: Grand Jury*
*2021 Subpoenas*, 87 F.4th 229, 249 (4th Cir. 2023); *United States v. Idema*, 118 F. App'x
740, 744 (4th Cir. 2005). Congress must speak clearly to preclude judicial review of
constitutional claims, and § 3486 contains no such bar. *See Webster v. Doe*, 486 U.S. 592,
603–04 (1988). The subpoenaed materials implicate well-established informational-
privacy interests in intimate medical and mental health data, including transgender

15

**ARGUMENT**

I.     **Patients and Their Parents Have a Fourth Amendment Right to Be Free from Unreasonable Search and Seizure of Their Private Medical Records**

The Fourth Amendment "guarantees the privacy, dignity, and security of persons against certain arbitrary and invasive acts by officers of the Government." *City of Ontario, Cal. v. Quon*, 560 U.S. 746, 755–56 (2010) (quoting *Skinner v. Railway Labor Executives' Assn.*, 489 U.S. 602, 613–14 (1989)). The Fourth Amendment's protection applies to administrative subpoenas. *See Fed. Trade Comm'n v. Am. Tobacco Co.*, 264 U.S. 298, 305-06 (1924) ("Anyone who respects the spirit as well as the letter of the Fourth Amendment would be loath to believe that Congress intended to authorize one of its subordinate agencies to sweep all our traditions into the fire, and to direct fishing expeditions into private papers on the possibility that they may disclose evidence of a crime.") (citation omitted). "Because a subpoena . . . leads to 'the *compulsory* production of private papers,'" Movants are "entitled to the Fourth Amendment's protection against unreasonableness." *In Re: Subpoena Duces Tecum*, 228 F.3d 341, 347 (4th Cir. 2000) (quoting *Hale v. Henkel*, 201 U.S. 43, 76 (1906)) (emphasis in original). To satisfy the Fourth Amendment's reasonableness standard, an administrative subpoena must be "(1) authorized for a legitimate governmental purpose; (2) limited in scope to reasonably relate to and further its purpose; (3) sufficiently specific so that a lack of specificity does

---

status. *See Whalen v. Roe*, 429 U.S. 589, 599–600 (1977); *Carpenter v. United States*, 585 U.S. 296, 306 (2018); *Powell v. Schriver*, 175 F.3d 107, 111 (2d Cir. 1999). Section 3486(a)(7) further ties these subpoenas to judicial-subpoena standards, which allow assertion of personal rights and privileges.

16

not render compliance unreasonably burdensome; and (4) not overly broad for the purposes of the inquiry as to be oppressive." *Id.* at 349; *see also Donovan v. Lone Steer, Inc.*, 464 U.S. 408, 415 (1984). Here, the subpoena lacks a legitimate purpose and is not limited in scope to reasonably relate to or further its supposed purpose, thus violating the Fourth Amendment.

### 1.    The Subpoena was Issued for an Improper Purpose

While courts generally will enforce an administrative subpoena that seeks information reasonably relevant to an inquiry within its statutory authority, the court's process is abused when a subpoena is "issued for an improper purpose, such as to harass" the recipient or "to put pressure on him to settle a collateral dispute." *United States v. Powell*, 379 U.S. 48, 58 (1964). This "requirement that subpoenas be used only for a legitimate and authorized governmental purpose prohibits the government from 'engag[ing] in arbitrary fishing expeditions' and from 'select[ing] targets of investigation out of malice or an intent to harass.'" *In Re: Subpoena Duces Tecum*, 228 F.3d at 349 (quoting *United States v. R. Enterprises, Inc.*, 498 U.S. 292, 299 (1991)).

Here, the court need only look to the explicit and official policy of this Administration to determine that the subpoena issued to CNH is motivated by animus towards transgender individuals and not for a legitimate purpose. The Administration has asserted that transgender citizens cannot lead an "honorable, truthful, and disciplined lifestyle,"[60] and that their medical treatment is part of a "warped ideology" and "evil and

---

[60] *Prioritizing Military Excellence and Readiness*, THE WHITE HOUSE (Jan. 27, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/prioritizing-military-

backwards lies" that cause physical harm.[61] As a result of that animus, the Administration has taken numerous actions to put an "end" to transgender medical treatments by seeking to "investigate and hold accountable medical providers" of such care.[62] The Attorney General has made abundantly clear the true, improper purpose behind these subpoenas. Using a criminal investigation to end medically necessary transgender healthcare by intimidating providers and patients is improper and evidence of bad faith.

The only two courts to publicly rule on substantively identical subpoenas have already found they were issued in bad faith. *See In Re: Admin. Subpoena No. 25-1431-019*, No. 1:25-mc-91324-MJJ, 2025 WL 2607784 (D. Mass. Sept. 9, 2025); *Queerdoc, PLLC v. U.S. Department of Justice*, No. 2:25-mc-00042-JNW, 2025 WL 3013568 (W.D. Wash. Oct. 27, 2025). In Massachusetts, the court considered the "astonishingly broad[,] virtually unlimited . . . scope" of the subpoena, and held that it "was issued for an improper purpose, motivated only by bad faith." *In Re: Admin. Subpoena No. 25-1431-019*, 2025 WL 2607784, at *6-*7.[63] In concluding that there was no proper purpose for

---

excellenceand-readiness/.

[61] *National Child Abuse Prevention Month, 2025*, THE WHITE HOUSE (April 3, 2025), https://www.whitehouse.gov/presidential-actions/2025/04/national-child-abuse-preventionmonth-2025/; *Department of Justice Subpoenas Doctors and Clinics Involved in Performing Transgender Medical Procedures on Children*, OFF. OF PUB. AFFS., U.S. DEP'T OF JUST. (July 9, 2025), https://www.justice.gov/opa/pr/department-justice-subpoenas-doctors-and-clinicsinvolved-performing-transgender-medical.

[62] U.S. OFF. OF THE ATT'Y GEN., MEMORANDUM FOR SELECT COMPONENT HEADS: PREVENTING THE MUTILATION OF AMERICAN CHILDREN at 4 (Apr. 22, 2025), https://www.justice.gov/ag/media/1402396/dl.

[63] The government filed both a motion to alter the district court's order quashing the subpoena issued to Boston Children's Hospital, as well as a notice of appeal. Mot. to Alter Judgment, *In Re: Admin. Subpoena No. 25-1431-019*, No. 1:25-mc-91324-MJJ (D.

the subpoena, the court explained that "the Administration has been explicit about its disapproval of the transgender community and its aim to end [transgender medical treatments]," and "the true purpose of issuing the subpoena is to interfere with the Commonwealth['s] right to protect [transgender medical treatments] within its borders, to harass and intimidate [the hospital] to stop providing such care, and to dissuade patients from seeking such care." *Id.* at *7. A Washington district court reached the same conclusion, stating "[n]o clearer evidence of improper purpose could exist than the Government's own repeated declarations that it seeks to end the very practice it claims to be merely investigating," *Queerdoc, PLLC*, 2025 WL 3013568, at *5, and that the Administration's subpoena amounts to nothing more than a fishing expedition, "as it seeks to rifle through thousands of patient records hoping to find something—*anything*— to justify its predetermined goal of ending [transgender medical treatments]." *Id.* at *6 (emphasis in original).

As in Massachusetts and Washington, DOJ has not, and cannot, set forth a legitimate enforcement purpose for the subpoena against CNH. Transgender medical treatments remain legal in Maryland as well as in the District of Columbia. And CNH provided its patients with care that was informed by research findings and in accordance with all applicable federal and state laws. Any allegation or conclusion otherwise is clear pretext for animus-based attempts to end transgender medical treatments nationwide. *See In Re: Admin. Subpoena No. 25-1431-019*, 2025 WL 2607784, at *7. The subpoena,

---

Mass. Oct. 7, 2025) (Dkt. No. 35); Notice of Appeal, *In Re: Admin. Subpoena No. 25-1431-019*, No. 1:25-mc-91324-MJJ (D. Mass. Nov. 7, 2025) (Dkt. No. 46).

therefore, was issued in bad faith and without any proper purpose, *In Re: Subpoena Duces Tecum*, 228 F.3d at 349, and its sweeping requests for the medical records and personal information of patients and their parents should be quashed.

>    2.    **The Sweeping and Virtually Unlimited Scope of the Subpoena Does Not Reasonably Relate to or Further its Supposed Purpose of Investigating Healthcare Fraud**

If the scope of a subpoena is "not relevant to a legitimate investigation, and overly broad . . . [that] can support a claim of unconstitutionality under the Fourth Amendment." *Id.* at 350. This "judicial protection" against a "sweeping or irrelevant order is *particularly* appropriate in matters where the demand for records is directed not to the [subpoenaed party] but to a third-party who may have had some dealing with the person under investigation." *United States v. Theodore*, 479 F.2d 749, 754 (4th Cir. 1973) (quoting *United States v. Harrington*, 388 F.2d 520, 523 (2d Cir. 1968)) (emphasis in original).

"A § 3486 subpoena must be issued in connection with an investigation of a federal healthcare offense and is limited to the production and authentication of documents and things that may be relevant to that investigation." *In Re: Subpoena Duces Tecum*, 228 F.3d at 350; *see also* 18 U.S.C. § 3486(a)(1). But here, the Administration is "seek[ing] an astonishingly broad array of documents and information that are virtually unlimited in scope." *In Re: Administrative Subpoena No. 25-1431-09*, 2025 WL 2607784, at *6; *see Gilmore v. Jones*, 339 F.R.D. 111, 124 (W.D. Va. 2021) ("The sheer breadth of the subpoenas shows that [the requestor] has embarked on a fishing expedition[.]").

The Administration's requests go far beyond what would be necessary for DOJ to investigate alleged violations of the FDCA, the False Claims Act, or any other conceivably legitimate investigative goal, insofar as the subpoena seeks "a staggering amount of personal health data related to [CNH's] patients, including their names, dates of birth, social security number, address, medical diagnoses, and patient intake documents." *Queerdoc, PLLC*, 2025 WL 3013568, at *6; *see also In Re: Sealed Case (Admin. Subpoena)*, 42 F.3d 1412, 1418 (D.C. Cir. 1994) (administrative subpoena does not give issuer "unfettered authority to cast about for potential wrongdoing"). Compelling disclosure of vast amounts of intensely personal medical information bears no relationship to any legitimate effort to investigate healthcare fraud and instead functions as an impermissible intrusion into protected patient privacy. The Administration's subpoena should therefore be quashed.

## II. Patients and Their Parents Have a Fifth Amendment Right to Privacy in Their Medical Records That Outweighs the Government's Interests

"The constitutional right to privacy extends to . . . 'the individual interest in avoiding disclosure of personal matters.'" *Walls v. City of Petersburg*, 895 F.2d 188, 192 (4th Cir. 1990) (quoting *Whalen v. Roe*, 429 U.S. 589, 599-600 (1977)).[64] The Fourth Circuit has adopted a two-part inquiry to determine whether personal information sought

---

[64] The Supreme Court, in *Dobbs v. Jackson Women's Health Organization*, distinguished between the right to shield information from disclosure, such as personal medical information, from "the right to make and implement important personal decisions without governmental interference," such as deciding to terminate a pregnancy. 597 U.S. 215, 273 (2022). In so holding, the Court did not question the right to informational privacy, tacitly affirming its validity. *Id.* at 273–92.

by the government is entitled to privacy protections. Courts "must . . . ask (1) whether a 'reasonable expectation of privacy' in the information exists as to entitle it to privacy protection and, if so, (2) whether 'a compelling governmental interest in disclosure outweighs the individual's privacy interest.'" *Payne v. Taslimi*, 998 F.3d 648, 657 (4th Cir. 2021) (quoting *Walls*, 895 F.2d at 192). Patients and their parents have a reasonable expectation of privacy in their medical records and the government's purported public interest in combating health care fraud does not outweigh patient interests in protecting the confidentiality of these records.

1.    **Patients and Their Parents Have a Reasonable Expectation of Privacy in Their Medical Records**

Patients and their parents undoubtedly have a reasonable expectation of privacy in their medical records, and the "reason . . . is apparent: medical treatment records contain intimate and private details that people do not wish to have disclosed, expect will remain private, and, as a result, believe are entitled to some measure of protection from unfettered access by government officials." *Doe v. Broderick*, 225 F.3d 440, 451 (4th Cir. 2000); *see also Am. Fed'n of State, Cnty. and Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, 771 F.Supp.3d 717, 781 (D. Md. 2025) ("It is almost self-evident that, in our society, PII, such as SSNs, medical information, and certain financial records, are regarded as private, sensitive, and confidential information."); *In re Grand Jury Subpoena John Doe No. A01-209*, 197 F. Supp. 2d 512, 514 (E.D. Va. 2002) ("[D]isclosure of a person's medical records implicates. . . the [constitutional] interest in avoiding disclosure of a patient's personal matters[.]").

22

Moreover, these privacy interests are heightened when they involve medical treatment and records relating to stigmatized health conditions, particularly when disclosure could subject patients to "discrimination and intolerance." *Doe v. City of New York*, 15 F.3d 264, 267 (2d Cir. 1994); *see also Watson v. Lowcountry Red Cross*, 974 F.2d 482, 487 (4th Cir. 1992) ("The stigma attached to AIDS lends even more weight to the argument that the medical records of its victims should receive scrupulously confidential treatment."). Simply put, patients' medical records relating to the diagnosis and treatment of their gender dysphoria contain precisely the sort of information the Constitution is intended to protect.

### 2. Patients and Their Parents' Interests in Protecting the Confidentiality of Their Medical Records Outweighs the Government's Interest in Compelling the Information

Once a movant establishes that a government subpoena intrudes into private matters that are constitutionally protected, "then the defendant has the burden to prove that a compelling governmental interest in disclosure outweighs the individual's privacy interest." *Walls*, 895 F.2d at 192. In engaging in this balancing test with respect to medical records, district courts in this Circuit regularly deploy a list of seven factors first laid out in *U.S. v. Westinghouse Elec. Corp.*, 638 F.2d 570 (3d Cir. 1980), in which the Third Circuit considered a similar privacy-based challenge to an administrative subpoena seeking employees' medical records. *See, e.g.*, *In re Subpoenas Duces Tecum Nos. A99-0001, A99-0002, A99-0003 and A99-0004*, 51 F. Supp. 2d 726, 738 (W.D. Va. 1999) (applying the *Westinghouse* factors in a § 3486 subpoena proceeding); *Patients of Dr. Solomon v. Board of Physician Quality Assur.*, 85 F. Supp. 2d 545, 547 (D. Md. 1999)

23

(applying the *Westinghouse* factors in a subpoena duces tecum proceeding). These factors consist of: (1) "the type of record requested," (2) "the information it does or might contain," (3) "the potential for harm in any subsequent nonconsensual disclosure," (4) "the injury from disclosure to the relationship in which the record was generated," (5) "the adequacy of safeguards to prevent unauthorized disclosure," (6) "the degree of need for access," and (7) "whether there is an express statutory mandate, articulated public policy, or other recognizable public interest." *Westinghouse*, 638 F.2d at 578. Here, the *Westinghouse* factors weigh decisively in Movants' favor to quash the subpoena.[65]

### A.    *Westinghouse* Factors One, Two and Three

The first three *Westinghouse* factors consider the type of record requested, the information it does or might contain, and the potential for harm in any subsequent disclosure. All weigh strongly in favor of quashing the subpoena as it relates to patient records. In fact, in related litigation concerning an identical subpoena issued to Children's Hospital of Philadelphia ("CHOP"), DOJ has already agreed the "subpoena requests sensitive health information about children, gender, and sexuality (factor 1), the records do in fact likely contain sensitive information (factor 2), and—because the information is sensitive—disclosures could cause embarrassment or harm (factor 3)."[66] The

---

[65] *See also A. et al*, 2:25-mc-01067 (W.D. Pa. Sept. 24, 2025), Dkt. No. 2 at 12-18 (brief in support of motion to quash identical subpoena issued to University of Pittsburgh Medical Center brought by transgender patients and their parents analyzing *Westinghouse* factors).

[66] *In Re: Subpoena No. 25-1431-014*, 2:25-mc-00039 (E.D. Pa. July 8, 2025), Dkt. No. 13 at 9-10.

government's own admissions make clear: the risk to privacy here is not hypothetical – it is real, immediate, and grave.

While all medical records are entitled to constitutional protection, the specific records at issue here – and the sensitive information they contain – merit even greater protection than is typically afforded to records of routine medical care. *See Westinghouse*, 638 F.2d at 581-82 (distinguishing routine x-rays from records "of a more personal nature" where "more intimate data is involved" which would require greater protection). Here, the subpoena seeks a shocking and exceptionally broad array of sensitive information. In the CHOP litigation, DOJ conceded that "[t]he Government does not quibble with the sensitivity of the patient information involved in this subpoena."[67] The subpoena requests the identities of patients, specifically minors (including those who were minors at the time of treatment) and their parents. This is information DOJ has demanded yet admits it does not currently need.[68] That alone weighs strongly against disclosure.

Beyond just seeking to uncover Movants' identities, DOJ also seeks unfettered access to a vast trove of information in patients' medical records concerning their gender dysphoria diagnoses and courses of treatment. This information includes sensitive details regarding patients' mental health, emotional states, physical health and development,

---

[67] *See In Re: Subpoena No. 25-1431-014*, 2:25-mc-00039 (E.D. Pa. July 8, 2025), Dkt. No. 13 at 10.

[68] *Id.* at 11 ("[T]he government is willing to work with CHOP to minimize the impact on vulnerable patients, such as by accepting anonymized records as a first pass with the potential for obtaining more information on specific records should the need arise.").

school experiences, friendships and family relationships, their parents' occupations, descriptions of their communities, and much more.[69] Any anonymization of these records would be insufficient to protect Movants' identities, as specific details contained therein – such as age, timeline of visits, type of treatment, and life circumstances – when put together, can easily render Movants identifiable. *See, e.g.*, Decl. of Parent C.C. at ¶ 18 ("I do not believe that redacting our names from my child's chart would meaningfully protect our privacy. During the course of my child's care, we shared numerous details that, when combined . . . could identify our family."); *see also Nw. Mem'l Hosp. v. Ashcroft*, 362 F.3d 923, 929 (7th Cir. 2004) (holding redaction of medical records would not be sufficient to protect patients' privacy interests). Moreover, the information sought is so deeply personal that "[e]ven if there were no possibility that a patient's identity might be learned from a redacted medical record, there would be an invasion of privacy." *Id.*

These records and their contents are worthy of the utmost protection, as their disclosure poses the risk of serious harm. *See, e.g.*, Decl. of Youth F.F. at ¶ 8 ("As a transgender person, I do not feel safe in public due to harassment I have experienced in public using public transportation, walking around, at my job, and at school. I have experienced unfair treatment as a transgender person, and private medical information regarding my medical transition being shared with anyone would put me at more risk for harassment and discrimination for being transgender in the aforementioned public

---

[69] *See supra* note 50.

spaces."). This is especially true "in light of the government's 'increasing use of computers and sophisticated information technology,' which 'greatly magnif[y] the harm to individual privacy that can occur from any collection, maintenance, use, or dissemination of personal information.'" *Tankersley v. Almand*, 837 F.3d 390, 395 (4th Cir. 2016) (quoting the Privacy Act of 1974, Pub. L. No. 93-579, 88 Stat. 1896). The Court should not allow such an intrusion.

      B.    *Westinghouse* Factor Four

The fourth *Westinghouse* factor, the injury from disclosure to the relationship in which the record was generated, also weighs in favor of quashing the subpoena as to patient records. The records the subpoena demands are a product of the crucial trust relationship between healthcare providers and their patients. Confidentiality is a touchstone of these relationships, because it "preserves individual dignity, prevents information misuse, and protects autonomous decision making by the patient."[70] Disclosure of the requested medical records would breach, and irreparably harm, the sanctity of that relationship. *See, e.g.*, Decl. of Parent H.H. at ¶ 14 ("As a parent, the idea of my child's confidential medical information being shared with the government would represent a profound violation of trust in the healthcare system."); *see also Nw. Mem'l Hosp.*, 362 F.3d at 929 ("If Northwestern Memorial Hospital cannot shield the medical records of its . . . patients' records from disclosure in judicial proceedings, . . . the hospital will lose the confidence of its patients, and persons with sensitive medical

---

[70] Julius Bourke & Simon Wessely, *Confidentiality*, 336 BMJ 888, 888 (April 19, 2008), https://pmc.ncbi.nlm.nih.gov/articles/PMC2323098/pdf/bmj-336-7649-prac-00888.pdf.

conditions may be inclined to turn elsewhere for medical treatment."). Any such

undermining of confidentiality risks destroying patients' trust in their healthcare

providers and "might prevent people from seeking help when needed."[71]

Research demonstrates that youth are often reluctant to disclose information about

being transgender and related medical concerns to healthcare providers, even when such

disclosure is important for their care, due to fears about privacy and the potential for

negative consequences.[72] The breach of confidentiality in this context would not only

irreparably damage the trust that is foundational to the patient-provider relationship, but

could also deter transgender individuals from seeking necessary medical care, thereby

exacerbating existing health disparities and putting their physical and mental well-being

at risk. *See, e.g.*, Decl. of Youth E.E. at ¶ 3 ("I believed when I was receiving treatment

that the conversations and information I provided about my medical condition and

treatment were confidential. I already have some mistrust of the medical system. And

disclosing my confidential patient records, including information about medical care

relating to me being transgender would invade my privacy. It would also make me even

more hesitant in the future to seek and obtain care."); *see also Nw. Mem'l Hosp.*, 362

F.3d at 929.

---

[71] *Id.*

[72] Gina M. Sequeira et al., *Transgender Youth's Disclosure of Gender Identity to Providers Outside of Specialized Gender Centers*, 66 J.ADOLESC. HEALTH 691, 696 (2020).

C.    *Westinghouse* Factor Five

Under the fifth *Westinghouse* factor, courts must also consider how likely the information is to be subject to unauthorized disclosure. The risk of harm from breaching confidentiality is especially acute for transgender patients, who already face pervasive stigma, discrimination, and even violence in many aspects of their lives, including healthcare settings. *See Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 612 (4th Cir. 2020) ("Transgender people frequently experience harassment in places such as schools . . . medical settings . . . and retail stores . . . and they also experience physical assault in places such as schools . . . and places of public accommodation . . . .[and] are more likely to be the victim of violent crimes.") (internal citations omitted). Transgender individuals are at a significantly higher risk of being targeted for harassment, social exclusion, and physical harm simply because of their transgender status. Disclosure of their medical records– particularly those containing sensitive information relating to gender transition medical treatment, mental health, and other relevant healthcare decisions – could result in involuntary public disclosure of transgender status, subjecting patients and their families to further discrimination, bullying, or violence. *Id.*

In fact, the American Medical Association has recognized an "epidemic of violence against the transgender community" and noted that "[a]ccording to available tracking, fatal anti-transgender violence in the U.S. is on the rise."[73] Given the heightened

---

[73] *AMA Adopts New Policies on First Day of Voting at 2019 Annual Meeting*, AM. MED. ASS'N (June 10, 2019), https://www.ama-assn.org/press-center/ama-press-releases/ama-adopts-new-policies-first-day-voting-2019-annual-meeting.

29

risk of violence faced by transgender individuals, any public disclosure of Movants'
identities would pose a serious threat to their safety and that of their families. This danger
would be significantly increased by any further disclosure of their medical records or
other deeply personal information, especially in light of the Administration's
characterization of this medically necessary care as child abuse. *See, e.g.*, Decl. of Parent
A.A. at ¶ 15 ("I am aware of the government's current public hostility toward transgender
people and its efforts to eliminate rights and protections for transgender individuals, and
this dangerous climate adds to my fear about the release of our identities.").

Despite these risks, no meaningful statutory safeguards exist on how DOJ might
use or share the information it seeks. While DOJ may not use or disclose information it
receives through the subpoena in "any administrative, civil, or criminal action or
investigation directed against the individual who is the subject of the information," 18
U.S.C. § 3486(e), that limitation is extremely narrow and, thus, mitigates very little with
respect to Movants' fears of further disclosure. It merely prohibits the Administration
from using the information against the patients themselves and can be overcome with a
court order. 18 U.S.C. § 3486(e)(1).

Moreover, DOJ announced its intention to "partner with state attorneys general to
*identify leads, share intelligence*, and build cases against hospitals and practitioners."[74] In
addition, the Attorney General "direct[ed] all U.S. Attorneys to investigate all suspected

---

[74] U.S. OFF. OF THE ATT'Y GEN., *Memorandum For Select Component Heads: Preventing
the Mutilation of American Children* at 3-5 (Apr. 22, 2025),
https://www.justice.gov/ag/media/1402396/dl (emphasis added).

cases" of transgender medical treatments and to "prosecute all . . . offenses to the fullest extent possible."[75] Since there is no explicit prohibition on the sharing of information received through a subpoena issued under 18 U.S.C. § 3486, identifying leads and sharing intelligence may mean providing patient information and data to state law enforcement officials. *See* 18 U.S.C. § 3486(e)(1); 5 U.S.C. § 552a(b)(7) (Privacy Act provision permitting disclosure to state law enforcement officials). Such information sharing is particularly concerning to any parent who sought medically-approved and legal care for their child, especially now that the Administration is characterizing this care as child abuse. *See, e.g.*, Decl. of Parent B.B. at ¶ 17 ("Once my child's records leave the health-care system and enter government files, I have no way to control how they are used, who will be able to read them, or how long they will be kept. I am deeply concerned that this loss of control will have long-term consequences for my child's privacy and sense of safety.").

        D.    *Westinghouse* Factors Six and Seven

The sixth and seventh *Westinghouse* factors—the degree of need for access and whether there is an express statutory mandate, articulated public policy, or other recognizable public interest militating toward access—do not outweigh the first five factors.

DOJ cannot articulate a legitimate need for comprehensive medical records for every patient who received either puberty blockers or hormone therapy during the

---

[75] *Id.*

relevant time period, which spans over five and a half years. For example, in the CHOP litigation, DOJ failed to identify a particularized need for patient and parent information. Instead, it made only general assertions that "the acts being investigated here are, at base, statutory violations commonly investigated by the Government in many contexts over many decades" and that "[t]he document requests here are common in such investigations."[76] Crucially, DOJ offered no facts even suggesting that these statutory violations are occurring at that hospital, undermining any claim of a legitimate investigatory purpose and revealing the subpoena as a tool for an improper political agenda.

DOJ's simultaneous issuance of extremely broad subpoenas lodged against twenty medical institutions—each demanding highly sensitive and confidential documents pertaining to patients and their families—reflects an overt political agenda rather than a genuine investigation into healthcare fraud. And DOJ has yet to articulate anything to the contrary. DOJ is seeking to "use its subpoena power to go on a fishing expedition" through "an astonishingly broad array of documents and information that are virtually unlimited in scope" that will undoubtedly disrupt care to patients. *In Re: Admin. Subpoena No. 25-1431-019*, 2025 WL 2607784, at *6. Factors six and seven favor quashing the subpoena rather than enforcing it.

***

---

[76] *In Re: Subpoena No. 25-1431-014*, 2:25-mc-00039 (E.D. Pa. July 8, 2025), Dkt. No. 13 at 7.

DOJ seeks to invade a deeply private and constitutionally protected sphere of Movants' lives. To do so it must "prove that a compelling governmental interest in disclosure outweighs the individual's privacy interest." *Walls*, 895 F.2d at 192. It fails to do so, and therefore the subpoena must be quashed.

## CONCLUSION

For the foregoing reasons, Movants respectfully request that this Court quash subpoena Requests 11, 12, and 13, and all other Requests to the extent such Requests or sub-Requests call for the production of the identities or personal health information of CNH patients and their parents or guardians.

Dated:  November 17, 2025

Eve L. Hill (Bar No. 11938)
BROWN GOLDSTEIN & LEVY, LLP
120 E. Baltimore St., Suite 2500
Baltimore, MD 21202
Tel: (410) 962-1030
Fax: (410) 385-0869
ehill@browngold.com

Jennifer L. Levi (Pro hac vice to be submitted)
GLBTQ LEGAL ADVOCATES &
DEFENDERS
18 Tremont Street, Suite 950
Boston, MA 02108
(617) 426-1350
jlevi@gladlaw.org

*Attorneys for Movants*